Norristown-Penn Trust Co. *v.* Middleton et al., Appellants.

Argued May 14, 1930.  Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*R. W. Archbald, Jr.,* for appellant.—Where a bank draft is drawn by a bank officer direct to his own creditor, there is a natural explanation, viz., that these drafts are habitually used to pay debts which are not the debts of the bank, and that the bank officer is simply making use of the facilities of his own bank: Goshen Nat. Bank v. State, 141 N. Y. 379.

Where a cashier's check is drawn to a third person and then endorsed and delivered by the cashier for his own debt, there is no presumption of misappropriation: Cheever v. R. R., 150 N. Y. 59; Johnson Co. v. Longley Co., 207 Mass. 52; McGlinn Distilling Co. v. Dervin, 260 Pa. 414.

Even though plaintiff's evidence of misappropriation was uncontradicted, its credibility and effect was for the jury: McGlinn Distilling Co. v. Dervin, 260 Pa. 414.

*Earl G. Harrison,* with him *Saul, Ewing, Remick & Saul,* for appellee.—The Uniform Fiduciaries Act applies to banks, to bank officers and to bank drafts.

While only two of the five drafts in suit were drawn and delivered after the passage in Pennsylvania of the Uniform Fiduciaries Act, the section of the act which imposes liability on defendants is merely declaratory of the law as it existed prior thereto: Schmitt v. T. & T. Co., 61 Pa. Superior Ct. 301.

As to the draft drawn to the order of a fictitious person, defendants received all they were entitled to when the trial judge submitted to the jury the question of their good faith in taking the draft and the question as to whether they were put upon notice of the possibility of fraud: Odd Fellows Home v. Velenchick, 73 Pa. Superior Ct. 153.

There is no doubt but that defendants received plaintiff's money; the steps taken by Moyer to cover up the fraud do not affect the rights of plaintiff against defendants.

Defendants introduced no testimony whatsoever and all of plaintiff's evidence negatives any thought of negligence in discovering the fraud: Odd Fellows Home v. Velenchick Bros., 73 Pa. Superior Ct. 153.

OPINION BY MR. JUSTICE SADLER, May 27, 1930:

The Norristown-Penn Trust Company was formed by the merger of two banking corporations, and Walter R. Moyer was its assistant treasurer. Accounts were kept by the former in Philadelphia institutions upon which checks or drafts were drawn, in the ordinary course of the banking business, by the officer named. In 1922, and the two succeeding years, five were so issued and are now the subject of controversy. The first was to the order of S. Miller, a fictitious person, endorsed in his name, but kept in the possession of Moyer until its transfer, without endorsement by him, to Middleton, Jr., & Co., defendants, in payment of his individual debt; three were drawn directly to the partnership for like purpose, and the fifth to one of the partners, handed by him to the firm and credited to Moyer's account. The undisputed evidence showed defendants were brokers, with whom the bank officer was carrying a speculative stock account, and the five obligations were issued to make good margin calls and used for this purpose. The bank was not indebted to the firm in any sum, and the drafts were knowingly taken to apply to the individual obligations of the assistant treasurer, who illegally signed them, thus embezzling the funds represented, acts resulting in his subsequent conviction and imprisonment. By false entries the five transactions were concealed for a time, but, when discovered, suit was brought by the bank to recover the amounts unlawfully diverted.

No conflict appears in the testimony offered by plaintiff, and no evidence was submitted by defendants, the latter resting on legal considerations to prevent judgment. The court held as a matter of law that recovery could be had for the moneys secured by reason of the last

four drafts accepted by defendants, the one issued in the name of the partner, Holmes, and handed to, and cashed by the firm, being treated as if drawn directly to it. A different question raised as to the first draft, drawn to a fictitious person, and endorsed by Moyer with the supposed payee's name. As to it the question of implied notice of the fraud, arising from the circumstances, was submitted to the jury, and a verdict for the full amount of all the drafts was rendered, with interest from the date that it acquired knowledge of the embezzlement. This finding as to interest was properly corrected by the court so that it should be calculated from the time the funds were wrongfully received, to conform with the instructions given, if the contention of plaintiff was sustained. The charge cannot justly be complained of, if the trust company was entitled to recover at all. Nor do we see merit in the suggestion that such negligence on part of plaintiff appeared in bringing suit so as to debar recovery, since an action was brought promptly when the defalcation was discovered, as it was later in the ordinary course of an accustomed bank examination. The actual facts were not disclosed until the embezzlement of Moyer was established: Odd Fellows Home v. Velenchick Bros., 73 Pa. Superior Ct. 153.

The real question requiring solution is the liability of the brokerage firm for sums received in payment of the treasurer's individual debt by drafts drawn by him on the funds of the bank. In determining this, it is necessary to classify those given, as the applicable rules of law differ. Four drawn directly to the brokers in payment of the margins in the speculative account, which included the one made payable to the individual partner for such purpose, and by him handed to his firm, may be jointly considered. As to these the court held, as a matter of law, a recovery could be had. The legal principle controlling was thus stated in Schmitt v. Potter Title & Trust Co., 61 Pa. Superior Ct. 301, cited with approval in Fehr v. Campbell, 288 Pa. 549: "The

law seems to be well settled that where an individual attempts to pay his personal indebtedness out of the funds of a corporation, partnership, an estate or a trust, by checks drawn against the funds of such corporation, partnership, estate or trust, the person who receives the same is put upon notice as to the right of the individual to pay his indebtedness out of the funds of the corporation, partnership, estate or trust, and is bound at his peril to inquire as to the right of the individual so to do." Moneys so wrongfully received may be recovered.

In other jurisdictions the same principle is applied: Note 29 L. R. A., n. s. 359. Thus it was said by the circuit court of appeals, in Anderson v. Kissam, 35 Fed. 699,—reversed, however, on the ground that the question of bad faith should have been submitted to the jury (145 U. S. 435),—cited on this argument: "But no usage, however common and well recognized, can be invoked to justify a banker, or anyone else, in taking money or negotiable paper in payment of an agent's debt, known to belong to his principal, or known to belong to a trust estate, to satisfy the trustee's personal debt, or to shield the banker from accountability, who wilfully closes his eyes and stops his ears to facts and circumstances which import notice that the agent or trustee is misappropriating the money or property entrusted to him."

As to the first two drafts now under consideration the law stated controls. Two others were put in circulation subsequent to the passage of the Uniform Fiduciaries Act (May 31, 1923, P. L. 468), which is merely expressive of the law as theretofore existing. It provides, in section 5, "If, however, such instrument is payable to a personal creditor of the fiduciary and delivered to the creditor in payment of, or as security for, a personal debt of the fiduciary to the actual knowledge of the creditor, or is drawn and delivered in any transaction known by the payee to be for the personal benefit of the fiduciary, the creditor or other payee is liable to the principal if the fiduciary in fact commits a breach of his

obligation as fiduciary in drawing or delivering the instrument." This section was called to the attention of, the jury in the charge as controlling, though two of the checks antedated its passage, but this is immaterial, since the responsibility of defendants, both before and after the act, was the same, and the court properly gave binding instructions for plaintiff as to the four notes, since it appeared, without contradiction, that all were executed by the assistant treasurer for his individual debt, and were paid from his corporation's funds.

Nor can we see force in appellant's suggestion that the section of the Fiduciaries Act of 1923 referred only to checks of officers of corporations, and not to drafts drawn on depositories of funds of the bank by authorized employees. This attempted distinction is based on the conclusion reached in Goshen Nat. Bank v. State, 141 N. Y. 379, which case turned, however, on proof of the existence of authority of the officer to draw the paper in the name of the bank. This is pointed out in Lamson v. Beard, 94 Fed. 30; see also Gale v. Chase National Bank, 104 Fed. 214. We see no reason for holding that a different rule should apply in the case of bank drafts from ordinary corporate checks since the Act of 1923 was passed. As before that legislation, the treasurer is to be treated as a fiduciary, and when he draws the bank paper ·to the order of his individual creditor, who receives the proceeds for the purpose of satisfying a personal claim, it can be compelled to reimburse the defrauded institution.

A different question is presented in the case of the first draft drawn to the fictitious person, S. Miller, endorsed by Moyer with that name, but held in the possession of Moyer, who transferred it to defendants as payment on his speculative stock account. It will be noticed that, in so far as the evidence shows, the payee was unknown to the brokers, and the paper itself was in the hands of the maker, who used it to satisfy his individual debt without placing his personal endorsement

thereon. We think the rule applicable in such case is that enunciated in the codification of 1923, supra, bearing on such transactions, which provides, in section 6, "If a check or other bill of exchange is drawn by a fiduciary as such......payable to a third person and by him transferred to the fiduciary, and is thereafter transferred by the fiduciary, whether in payment of a personal debt of the fiduciary, or otherwise, the transferee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in transferring the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary *unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith.*" (The italics are ours.)

The court did submit to the jury the question of the mala fides of the brokers. Attention was called to the fact that Moyer, the treasurer, signed the draft and had possession of it when he handed it to Middleton, Jr., & Co., without the individual endorsing of it. S. Miller was unknown to the creditor who used the funds received in payment of the treasurer's speculative debt. It appeared, without contradiction, that the funds of the bank were thus misappropriated. Based on these circumstances, showing a transfer not in the ordinary course of business, the question of good or bad faith was submitted to the jury, and it found for the plaintiff. The mere fact that the maker of the corporate obligation, who is an officer, produces it, though payable to and endorsed by another is not in itself enough to show its fraudulent use, nor is it absolutely essential that the holder personally endorse the instrument, if he delivers it. "While the courts are careful to guard the interest of commerce by protecting the negotiation of commercial paper, they are also careful to guard against fraud, by defeating titles taken in bad faith, or with knowledge, actual or implied, which amounts to bad faith, when re-

garded from a commercial standpoint": Fehr v. Campbell, 288 Pa. 549, 563.

"Where the circumstances are such as to justify the conclusion that the failure to make inquiry arose from a suspicion that inquiry would disclose a vice or defect in the instrument or transaction, such endorsee is charged with knowledge": 8 C. J. 505. The facts and circumstances may be so suspicious as to be evidence of bad faith sufficient to take the question to the jury: 8 C. J. 501. "Bad faith in taking commercial paper does not necessarily involve furtive motives, for it exists when the purchaser has notice of facts which, if unexplained, would show that *he was taking the property of one who owed him nothing in payment of a claim that he held against someone else"*: Fehr v. Campbell, supra, page 560. While notice of defect in title to paper, or bad faith, is not presumed, the fact may be established by circumstances. Where fraud in the inception of the transaction appears, the conclusion of notice to the holder may be justified, and the fact that the manner of negotiation is unusual, as here, and not the way ordinarily followed in the course of business, is some evidence of bad faith: Central State Bank v. Peoples Savings Bank (Iowa), 194 N. W. 233. In this case, the maker was the treasurer, whom the defendants were bound to know had no right to use the bank's draft to pay his own debt. It was produced from his possession, though another unknown is named as payee, who seemingly endorsed the paper, and defendants accepted it without the individual endorsement of Moyer. The jury might find from the use of the draft for a personal debt by the officer who executed it, and to whom it had been returned, evidence of improper conduct by the transferror: First National Bank v. Gerli, 232 Pa. 465, 471. (See also Brown v. Pettit, 178 Pa. 17, though in the case last mentioned the name of the firm defrauded had been endorsed on the back of the obligation.)

Appellant relies for a contrary conclusion on two cases. In one, Johnson & Kettell Co. v. Longley L. Co., 207 Mass. 52, 92 N. E. 1035, the statement is made, as quoted in the brief, that where a note is given by the corporate officer to a third person, endorsed by the latter in blank, and used to pay the maker's individual debt, "the transaction on its face is good unless it is proved to be bad." But this is followed by the statement, not referred to, page 1037, "If the corporation proves that the application of the note or other instrument of the corporation was a wrongful one, the rights of the creditor depend upon his having acted in good faith." The second decision (Cheever v. P., S. & L. E. R. Co., 150 N. Y. 59, 44 N. E. 701) dealt with a corporate note made payable to one Bruen,—who, as a matter of fact, was the secretary of the president, and endorsed it,—and the same was transferred to a third party who advanced sums for the personal use of the corporate officer. When the case first came before the court of appeals it was held that error had been committed below in holding, as a matter of law, that there could be no recovery by a subsequent innocent holder in due course, and the judgment was reversed. The case again came for trial (Cheever v. P., S. & L. E. R. Co., 50 N. Y. S. 1067), and it was then decided that the jury must determine whether bad faith appeared when the payee was merely a nominal party who endorsed to a firm in which the president was a party, and the latter used it for his individual debt. On appeal, it was then determined that the character of the paper, the fact that the payee was a mere straw man upon whose individual credit the money was not loaned, the speculative nature of the entire transaction, and the failure to make inquiry under such circumstances, made necessary the passing by the jury on all these facts to determine the question of good faith. The case was again reversed and the record remitted with directions to submit these matters which could not be determined as a matter of law.

The situation here is similar. Moyer signed the draft on the plaintiff's account. Had Middleton, Jr., & Co. been payee and collected, a recovery could plainly be had for the amount received. Even when made to a third person, fictitious and unknown, if the obligation came back into the hands of the treasurer and maker, who again used it, and paid therewith his individual gambling debt, the transaction was so outside the ordinary course of business as to put the brokers on notice and raise more than a mere suspicion of the regularity of the transaction. The draft was accepted in payment of the margins due by the signing bank officer without inquiry, which would have disclosed the truth. The jury found the defendants acted in bad faith in thus taking the funds of the bank to satisfy the debt of Moyer. We think the conclusion justified by the evidence presented. It follows that the defendants must repay the corporate funds wrongfully secured from the proceeds of all of the five drafts accepted.

The judgment is affirmed.